IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **CLIFTON GATLIN;** | § | |
| *PLAINTIFF* | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **JOHN M. O'QUINN & ASSOCIATES,** | § | **JURY TRIAL REQUESTED** |
| **PLLC D/B/A THE O'QUINN LAW FIRM,** | § | |
| **JOHN M. O'QUINN & ASSOCIATES L.L.P.,** | § | |
| **JOHN M. O'QUINN, P.C., JOHN M. O'QUINN** | § | |
| **LAW FIRM, PLLC** | § | |
| **T. GERALD TREECE, INDEPENDENT** | § | |
| **EXECUTOR OF THE ESTATE OF JOHN M.** | § | |
| **O'QUINN, DECEASED,** | § | |
| **CHRISTIAN A. STEED,** | § | |
| **MICHAEL J. LOWENBERG,** | | |
| **RICHARD LAMINACK,** | § | |
| **BUFFY MARTINES,** | § | |
| **THOMAS W. PIRTLE,** | § | |
| **ABEL MANJI** | § | |
| *DEFENDANTS* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Plaintiff, **CLIFTON GATLIN,** hereinafter referred to as Plaintiff, and files this Original Complaint against **JOHN M. O'QUINN & ASSOCIATES, PLLC D/B/A THE O'QUINN LAW FIRM, JOHN M. O'QUINN & ASSOCIATES L.L.P., JOHN M. O'QUINN, P.C., JOHN M. O'QUINN LAW FIRM, PLLC., CHRISTIAN A. STEED, MICHAEL J. LOWENBERG, RICHARD N. LAMINACK, BUFFY MARTINES, THOMAS W. PIRTLE,** and **ABEL MANJI** hereinafter collectively referred to as Defendants, and would respectfully show as follows:

# I
# PLAINTIFF

1.    CLIFTON GATLIN is an adult resident citizen of Mississippi.

# II
# DEFENDANTS

1.    JOHN M. O'QUINN & ASSOCIATES, PLLC D/B/A THE O'QUINN LAW FIRM is a Professional Limited Liability Company formed and doing business in Texas and may be served with citation by serving its' registered agent, David L. Griffis, at 1401 McKinney Street, Suite 1700, Houston, Texas 77010.

2.    JOHN M. O'QUINN & ASSOCIATES L.L.P. is a Limited Liability Partnership formed and doing business in Texas and may be served with citation by serving its' managing partner, Christian Steed, at 1170 Silber Rd., Houston, Texas 77055.

3.    JOHN M. O'QUINN, P.C., is a Professional Corporation formed and doing business in Texas and may be served with citation by serving its' managing partner, Christian Steed, at 1170 Silber Rd., Houston, Texas 77055.

4.    JOHN M. O'QUINN LAW FIRM, PLLC is a Professional Limited Company formed and doing business in Texas and may be served with citation by serving its' managing partner, Christian Steed, at 1170 Silber Rd., Houston, Texas 77055.

5.    T. GERALD TREECE, AS INDEPENDENT EXECUTOR OF THE ESTATE OF JOHN M. O'QUINN, DECEASED, is the executor and representative of the Estate of John M. O'Quinn, deceased, and may be served by serving T. Gerald Treece at his principle place of business, 1303 San Jacinto Street, Houston, Texas 77002.

6.      CHRISTIAN A. STEED is an individual practicing law in Texas and can be served with citation at his principal place of business, The O'Quinn Law Firm, at 1170 Silber Rd., Houston, Texas 77055.

7.      MICHAEL J. LOWENBERG is an individual practicing law in Texas and can be served with citation at his principal place of business, The O'Quinn Law Firm, at 1170 Silber Rd., Houston, Texas 77055.

8.      RICHARD N. LAMINACK is an individual practicing law in Texas and can be served with citation at his principal place of business, Laminack, Pirtle & Martines, 5020 Montrose Boulevard, 9th Floor, Houston, TX 77006-6533.

9.      BUFFY MARTINES is an individual practicing law in Texas and can be served with citation at her principal place of business, Laminack, Pirtle & Martines, 5020 Montrose Boulevard, 9th Floor, Houston, TX 77006-6533.

10.     THOMAS W. PIRTLE is an individual practicing law in Texas and can be served with citation at his principal place of business, Laminack, Pirtle & Martines, 5020 Montrose Boulevard, 9th Floor, Houston, TX 77006-6533.

11.     ABEL MANJI is an individual practicing law in Texas and can be served with citation by serving him at his principle place of business, 12603 Southwest Freeway, Suite 688, Stafford, Texas 77477.

### III
### JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332, Diversity Jurisdiction, and the amount in controversy exceeds $100,000.00.

2.      Venue is proper in the Southern District of Texas – Houston Division because all, or a substantial part of the events or omissions giving rise to the claims occurred in this division.

*See* 28 U.S.C. § 1391(b)(2). Furthermore, venue is appropriate in the Southern District of Texas – Houston Division because one or more Defendants reside in this district and all Defendants are residents of Texas. *See* 28 U.S.C. § 1391(b)(1).

**IV**
**CLAIM OF RELATEDNESS AND REQUEST TO TRANSFER**

1.      This action should be heard before and/or transferred to the Honorable Judge Lynn N. Hughes in the interest of commodity, judicial economy and to conserve judicial resources because Judge Hughes has already heard and decided similar factual issues in a related matter. *See Green v. Primerica Disability Income Plan,* No. 92-1496, 1993 U.S. App. LEXIS 39700, at \*8 (5th Cir. 1993); *United States v. Stone*, 411 F.2d 597 (5th Cir. 1969); 28 U.S.C. § 137.

2.      Specifically, Judge Hughes has recently presided over a related action, Case No. 4:12-cv-02850; *Ironshore Indemnity, Inc. v. John M. O'Quinn & Associates, P.L.L.C., et al.*; in the United States District Court for the Southern District of Texas, Houston Division (the "Ironshore Matter"). In the Ironshore Matter, an insurer of The O'Quinn Law Firm ("O'Quinn") filed a declaratory judgment action against O'Quinn alleging that it was not obligated to defend the firm against its former silicosis clients because the firm and its lawyers knew about the malpractice claims before the insurer issued its policy. Judge Hughes rejected O'Quinn's claim that it was only aware of some of the malpractice claims against it as "disingenuous" and "logically impossible," opining that O'Quinn should have known as soon as one former silicosis client filed suit that similar claims would follow.[1] Judge Hughes has already found that "O'Quinn acted deliberately and dishonestly with **all of its** prior silicosis clients and had clear

---

[1] A copy of this Opinion is attached hereto as Exhibit A.

prior knowledge of its wrongful actions," and thus granted the insurer's motion for summary judgment on August 31, 2015.[2]

3.      Plaintiff Clifton Gatlin is one of the former O'Quinn clients with whom the firm and its lawyers acted "deliberately dishonest" towards. "District Judges have the inherent power to transfer cases from one to another for the expeditious administration of justice." *Stone*, 411 F.2d at 599. This case should be heard by Judge Hughes because it would be more efficient for him, being familiar with the specific facts and circumstances of this case, to remain the judge rather than this case be assigned to another district court judge who would lack the same familiarity. *See Hill v. Breazeale*, 197 F. App'x 331, 335 (5th Cir. 2006). Accordingly, this case should be transferred to and heard by Judge Hughes. *See United States v. Martinez*, 686 F. 2d 334 (5th Cir. 1982)(judges have "inherent authority" to transfer cases between them).

## V
## FACTS & ALLEGATIONS

1.      This case arises out of the horrific malfeasance committed by The O'Quinn Law Firm and its' attorneys during the representation of Plaintiff Clifton Gatlin ("Gatlin") who was diagnosed with the incurable and potentially fatal disease of silicosis. In short, The O'Quinn Law Firm and its attorneys agreed to, but failed to process, approximately $975,000 in settlements with various underlying silica defendants. Moreover, these lawyers breached their fiduciary duties by engaging in egregious expense misconduct, such as charging Plaintiff an arbitrary pro-rata portion of "general expenses" in an amount of approximately $87,540. The unfortunate series of events is as follows.

2.      Gatlin is a forty-seven (47) years old widower with three children. Gatlin worked as a sandblaster between 1989 and 2003, sandblasting the inside and outside of water towers. In

---

[2] *See* Exhibit A, at p. 2 (emphasis added).

2003, after experiencing shortness of breath, Gatlin visited his doctor who referred him to a pulmonologist, Dr. Middleton. Gatlin underwent a series of x-rays, cat scans and ultimately had a lung biopsy which confirmed the presence of silicosis. Gatlin is a lifetime nonsmoker. Dr. Middleton referred Gatlin to lawyers in Mississippi, Grenfell, Sledge & Stephens ("Grenfell Sledge"), who ultimately associated Gatlin's case with The O'Quinn Law Firm ("O'Quinn" or the "Firm").

3.     Around this time, O'Quinn and Grenfell had entered into a joint venture to accumulate and amass a silicosis docket through legal means, such as obtaining clients through advertising and referring attorneys, as well as illegal means, such as obtaining clients through barratry and paying medical screening companies, such as N&M, Inc., a referral fee for every client solicited. Eventually, O'Quinn and Grenfell represented approximately three-thousand (3,000) clients who were alleged to be occupationally exposed to silica-containing products and materials and alleged to have been diagnosed as having silica related diseases against numerous manufacturers and distributors of silica related products, materials and/or protective equipment (hereinafter the "Silicosis Defendants").

4.     Defendants filed Plaintiff's underlying silica case in the District Court of Jefferson County, Texas in the early 2000s against numerous Silicosis Defendants. Richard Laminack ("Laminack"), Thomas Pirtle ("Pirtle"), Joseph Gibson ("Gibson"), Anna Dean Kamins, formally known as Anna Farmer ("Farmer") and Buffy Martines ("Martines") (collectively the "Lawyers"), all employees of O'Quinn, were listed as counsel for Plaintiff in his case filed in Mississippi or in the subsequent Federal Multi-District Litigation. These attorneys, in addition to Mr. O'Quinn, were the original attorneys working on the Firm's silicosis docket. When one or more of these attorneys departed, Abel Manji ("Manji") took over the day-to-day

operations of the docket. Christian Steed ("Steed") eventually acted as the managing attorney over the entire Firm, including the mass-tort division.  Dana Morris ("Morris") later assisted Steed in managing the file destruction project initiated by Steed as set forth in detail below.

5.     After filing the underlying silicosis lawsuit, O'Quinn had Gatlin screened by Dr. Gary K. Friedman, a Pulmonologist who is Board Certified in Internal Medicine and Occupational Medicine. In addition to the previous diagnosis by Dr. Middleton, Dr. Friedman diagnosed Gatlin with sever, acute and chronic silicosis caused by his occupational exposure and opined that he had less than a few years to live unless he received a lung transplant. Ultimately, Gatlin was forced to undergo a double lung transplant.

6.     Based on the severity of Gatlin's exposure, O'Quinn entered into and/or agreed to settlements or claims with various underlying Silicosis Defendants and ensured Gatlin that his case was worth millions, stating "I have told Clifton [Gatlin] that his settlement will be over $4M." Unfortunately, however, O'Quinn and its attorneys failed to finalize and/or process approximately $1,374,500 in settlements or claims which they had entered into on behalf of Gatlin, including: (1) $250,000 3M settlement; (2) $25,000 Sullair settlement; (3) $250,000 Specialty Sand settlement; (4) $4,500 Sanstorm settlement; (5) $40,000 Dependable Abrasives settlement; (6) $50,000 Vallen settlement; $75,000 Kelco settlement; (7) $100,000 Bullard settlement; (8) $150,000 Halliburton settlement; and (9) $400,000 Custom Aggregates settlement. In addition, O'Quinn had agreed to a $25,000 settlement with Moldex, but negligently accepted only $20,000 to settle the claim. These settlements or claims were lost because Defendants simply failed to process and/or finalize settlement agreements. Had Defendants exercised reasonable diligence, the Silicosis Defendants would have finalized the foregoing settlements and Plaintiff would have received these funds.

7.    In his February 25, 2005 resignation letter to Laminack, Gibson uttered the inevitable truth affecting the Firm's silicosis docket: "[w]e are going to lose every settlement we have made because we won't process them."   This is exactly what happened to the Firm's settlements with silica defendants, Sanstorm, Moldex and many others. As noted above, Plaintiff was entitled to a settlement with Sanstorm (also known as Air Liquid). On November 7, 2002, Pirtle, on behalf of the Firm, entered into a Rule 11 Agreement with Sanstorm.  The settlement with Sanstorm was for approximately $5,250,000.00.  By February 25, 2005, Gibson informed Laminack that "Sandstorm will stand by their settlement if we send it out now."  However, the paperwork never went out and Plaintiff never received any settlement proceeds from Sanstorm. Had the Firm simply enforced the Rule 11 Agreement and processed the settlement, Plaintiff would have obtained his portion of the settlement.

8.    Some of the other settlements or claims were lost because Defendants erroneously non-suited and dismissed certain Silicosis Defendants because they were getting close to trial. More specifically, on January 16, 2003, Gibson signed a non-suit as to several Silicosis Defendants, including Vallen and Kelco, because he was "scared" to try the case. After this erroneous non-suit, these Silicosis Defendants refused to honor the previously agreed settlements. The Firm and its attorneys, including Laminack, were aware that Plaintiff's case had been wrongfully dismissed before releases had been signed or settlements had been paid. Yet, the Firm and its employees chalked them off as a loss and did not "waste time checking every lawsuit [they] filed against the Court records to see which cases have or have not been dismissed." Instead, they figured "[w]hat's done is done." These wrongful dismissals were never disclosed to Plaintiff.

9.    With regard to the settlements that were processed, O'Quinn and its attorneys wrongfully retained the settlement proceeds for its own use and failed to distribute the funds in a timely manner or apply the proceeds to the expenses, thus forcing Plaintiff to incur unnecessary interest and unnecessary costs for future expenses.   For example, Defendants negotiated a $500,000 settlement with Clemco on September 4, 2004. However, Defendants did not process and distribute these funds to Plaintiff until October 2006 and March 2007. Similarly, Defendants had negotiated an $850,000 settlement with MSA and had the money sitting in their account since July of 2004. Defendants took over five (5) months to distribute these funds, and Plaintiff was paid no interest.

10.    Another serious issue with the representation related to the deduction of "general expenses." Although Plaintiff agreed to pay "a share of certain common expenses for things being done for the benefit of [his] case and other Silicosis Dust Exposure cases", Plaintiff was required to pay to O'Quinn an arbitrary 3.0 % of any settlement he obtained towards these general expenses. All total, Plaintiff paid over $87,000 in general expenses. With each settlement, Defendants forced Plaintiff to sign affidavits *subsequently* agreeing to have "Silica General Expenses" and the arbitrary 3.0% pro-rata portion of these general expenses deducted from his settlement prior to O'Quinn releasing any of his settlement funds. Thus, O'Quinn and its attorneys held Plaintiff's settlement funds hostage unless he signed a new agreement consenting to a 3.0% pro-rata general expense charge. Defendants never disclosed the pros and cons or the advantages and disadvantages of this new subsequent agreement. Furthermore, Plaintiff was never advised to seek outside counsel prior to entering into these new agreements, nor was the new subsequent agreements fair and reasonable to Plaintiff.

11.    The general expenses were not reasonable and were not spent in furtherance of Plaintiff's case. First, a "huge number" of other client case specific charges were being billed to Silicosis General simply because "employees didn't take time to look up client case numbers." In the same regard, O'Quinn, under the management of Mr. O'Quinn, Laminack and Pirtle permitted numerous charges to be billed to Silicosis General for work done in the Texas State cases that had nothing to do with the Mississippi MDL and vice versa. Thus, Plaintiff was charged expenses for his case that he never actually incurred. These excess charges were never disclosed to Plaintiff and Plaintiff was never reimbursed for these excess charges.

12.    By 2003 the litigation expenses for O'Quinn's silicosis docket was "out of control." Just two years into the litigation, expenses for the 3,000 clients amounted to over $10 million dollars. $1.7 million was paid to the referral lawyers for screening cases and hundreds of thousands went to a medical screening company named N&M, Inc. for screening and referring O'Quinn the cases. Rather than spend money on securing evidence of liability, O'Quinn, led by Mr. O'Quinn, Laminack and  Pirtle,  squandered hundreds of thousands of dollars through frivolous conduct. The Firm would bill its' overhead as "expenses" to the clients. In just one instance, the Firm spent over $60,000.00 on an "elaborate" database to manage the silicosis docket that not one employee ever put a scrap of information into other than general contact information already contained in other databases. Additionally, employee travel expenses were overly excessive.  There were dinner tabs for $1,000.00, $100.00 bottles of wine and liquors, and expensive cigars, all of which were billed to the clients, including Plaintiff and charged to Silicosis General. Moreover, instead of flying coach, employees of the Firm would unnecessarily upgrade to first-class and simply bill the clients, including Plaintiff. In fact, Mr. O'Quinn billed flights on his private jet to the Silicosis General file.

13.   Additionally, the Firm's attorneys, all under the management of Mr. O'Quinn and Laminack unreasonably increased the expenses in the silicosis cases through carelessness and disregard. These attorneys hired medical experts and paid up front fees of $20,000.00 or more to render an expert report only to find out that the experts were not qualified experts in the first place or that they were not the type of experts that the Silicosis Defendants required in order to settle. O'Quinn still billed these charges to Plaintiff. Further, the Firm incurred "thousands and thousands of dollars" in unnecessary hotel and meeting room costs caused by the Firm's employees scheduling depositions for plaintiffs and fact witnesses and then canceling said depositions because the Firm's employees simply did not want to attend. Mr. O'Quinn and Mr. Laminack permitted such conduct to occur. More egregious however is that O'Quinn and its attorneys would (on numerous occasions) bill two-to-three day trips as expenses to cover a hearing that lasted only a few hours. All these charges were billed to Silicosis General of which Plaintiff had to pay his arbitrary, non-authorized 3.0% share.

14.   Aside from the $87,000 in arbitrary general expenses, Plaintiff was required to pay over $50,000 in individual expenses relating to his specific case. These individual expenses included expert witness costs, individual deposition costs and travel expenses related to his individual case. Many of the expenses were unreasonable. For instance, Defendants paid Dr. Friedman over $40,000 for work allegedly performed on Plaintiff's case. However, $12,200 of this amount included cancelation fees for trial and depositions that never occurred because Defendants negligently failed to follow through with the depositions and trial. Likewise, approximately $10,000 of this amount was incurred for trial preparation for a trial that never occurred because the lawyers were too afraid to try the case. Most egregious, however, is the fact that $5,900 of the $40,000 was double-billed – that is, Dr. Friedman was negligently paid twice

for the same work performed. Defendants did not catch this error and no refund was ever submitted to Plaintiff. Plaintiff did not have the internal invoices and, therefore, could not have discovered this error.

15.    Lastly, it is alleged, based on information and belief, that Plaintiff did not receive all of the settlement funds he was entitled to receive out of the settlements that were processed by Defendants. More specifically, after Plaintiff settled with certain Silicosis Defendants, these Silicosis Defendants had agreed to pay the settlement to an annuity. However, it does not appear that these wire transfers ever occurred. Accordingly, Plaintiff brings this lawsuit to recover any settlement funds that were negligently and/or intentionally withheld from Plaintiff.

16.    Moreover, and equally egregious, after a group of former Texas silicosis clients brought suit against O'Quinn for the foregoing conduct, Steed and Michael J. Lowenberg ("Lowenberg") and apparently others connected to the Firm set about a course of conduct to destroy, shred and alter documents contained in all of the their silicosis clients files, including Plaintiff. To conduct this enormous task, the Firm hired a temp service of approximately twenty people comprised of both lawyers and non-lawyers to alter the clients' files.  During this process, Manji witnessed "thousands" of documents being taken out of the silicosis clients' files and "thrown in the trash can" and "shredded" after the Texas litigation had ensued.  The document shredding and altering of the clients' files occurred day after day for several months over Manji's strong objection.  Manji strongly objected to Steed and other members of the Firm, including Dean T. Gerald Treece, the current Executor of Mr. O'Quinn's estate, however, the spoliation of client files continued over Manji's objections to the contrary.

## VI
## CAUSES OF ACTION AND THEORIES OF LIABILITY

1.      Based on the above, it has become necessary to bring this suit to collect a legal debt of money damages owing to Plaintiff due to the conduct described herein. The conduct described herein constitutes negligence, breach of fiduciary duty, breach of contract, fraud, constructive fraud, fraud by non-disclosure, misapplication of fiduciary property and violates the Texas Deceptive Trade Practices Act. Defendants Mr. O'Quinn, Laminack, and Steed's actions also constitute negligent supervision.

A.      NEGLIGENCE

2.      In addition to the allegations and instances of malfeasance outlined above, the following errors and/or omissions constitutes negligence: (1) Failure to diligently represent Plaintiff in his silicosis-related claims; (2) Failure to preserve Plaintiff's claims, rights and defenses in his silicosis-related claims; (3) Failure to protect Plaintiff's interests in his silicosis-related claims; (4) Failure to properly and timely obtain and disburse settlement proceeds from the underlying Silicosis Defendants; (5) Failure to keep accurate billing and expense records; (6) Failure to properly and accurately deduct expenses; (7) Failure to properly inform Plaintiff regarding the material facts of his case; and (10) Failure to property process and complete settlements with the Silicosis Defendants which had been agreed-to.

3.      Of course, nothing Plaintiff did, or failed to do, caused or in any way contributed to cause the occurrences that resulted in losses and damages to Plaintiff.  On the contrary, the Defendants fell below the standard of care for attorneys practicing law in Texas, and thus, the Firm and its attorneys' conduct was a proximate and/or producing cause of Plaintiff's losses and damages.

**B.**    **GROSS NEGLIGENCE**

4.      The acts and omissions of Defendants as described herein constitute gross negligence for which Plaintiff now sues.  Defendants owed Plaintiff a duty to render legal services with the care, skill and diligence of an attorney of ordinary and reasonable skill and knowledge.  Defendants failed to perform as attorneys of ordinary and reasonable prudence. Moreover, however, Defendants wholly failed to uphold these duties.  Instead, Defendants chose to treat Plaintiff with an entire want of care, such that Defendants' actions constitute an actual conscious disregard to the rights, welfare and safety of Plaintiff.  Defendants' gross negligence proximately resulted in legal damages, for which Plaintiff sues.

**C.**    **BREACH OF FIDUCIARY DUTY**

5.      An attorney client relationship existed between Plaintiff, O'Quinn and the Firm's attorneys.  Thus, the Firm and these attorneys owed Plaintiff various fiduciary duties as a matter of law, including: (1) Duty to act with loyalty and utmost good faith and fair dealing; (2) Duty to act with absolute perfect candor, openness, and honesty, without any deception or concealment, no matter how slight; (3) Duty to be strictly honest about fee agreements and to refrain from self-dealing; (4) Duty to fully and fairly disclose to Plaintiff all matters material to the representation; (5) Duty to turn over funds belonging to Plaintiff timely and promptly; (6) Duty to follow Plaintiff's instructions; (7) Duty to make full and fair disclosure of the terms of a proposed settlement to Plaintiff; (8) Duty to place the Plaintiff's interests ahead of Defendants interests.

6.      Defendants intentionally breached these fiduciary duties as set out above. Specifically, these attorneys placed their own interests above those of Plaintiff. This was accomplished by, among other things, (1) failing to timely distribute settlement proceeds; (2) charging excessive and/or unnecessary expenses; (3) charging Plaintiff general case expenses for

those expenses relating to *other* silicosis clients cases or cases rather than specifically to Plaintiff; (4) failing to notify or disclose to Plaintiff "problems" or "issues" that arose during the representation, including the disallowance of their settlements or bankruptcy claims; (5) holding settlements hostage unless Plaintiff agreed to pay a 3.0% pro-rata share of the general expenses; (6) holding settlement funds to pay future expenses instead of timely distributing settlement funds to clients; (7) entering into new subsequent contracts with Plaintiff permitting O'Quinn to deduct silicosis general expenses without advising Plaintiff of the pros and cons, advantages, disadvantages, implications and nature of such subsequent agreement or advising them to seek outside counsel even when this new subsequent agreement was not fair and/or reasonable to Plaintiff; (8) deducting improper or excessive expenses from Plaintiff's settlement proceeds; and (9) destroying and altering Plaintiff's litigation files, including documents which may show their misconduct, after the Texas litigation had ensued and knowing that litigation involving other clients may ensue. The breaches described herein proximately caused Plaintiff's damages for which he now sues.

### D.     BREACH OF CONTRACT

7.     The acts and omissions of the Firm as described above constitute breach of contract, for which Plaintiff now sues.  The contingency fee contract entered into between the Firm and Plaintiff did not permit O'Quinn to deduct an arbitrary 3.0% pro-rata share of the General Expenses from Plaintiff's settlements. Moreover, the Firm breached its contract with Plaintiff by charging Plaintiff for Silica General Expenses when the contracts never permitted the Firm to do so and by charging Plaintiff an arbitrary 3.0% pro-rata portion of General Expenses, which was also never agreed to.

8.      Moreover, the Firm breached its contract with Plaintiff by charging unnecessary and/or excessive expenses and charging Plaintiff individually for expenses relating to *other* silicosis clients' cases, and/or cases relating to the litigation which should not have been charged to Plaintiff. The Firm also breached its contract with Plaintiff by charging fees and expenses from settlements. The Firm's breaches of contract resulted in legal damages to Plaintiff and/or an improper benefit to the Firm for which Plaintiff now sues.

E.      VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT

9.      Pursuant to *Latham v. Castillo*, 972 S.W.2d 66, 68 (Tex. 1998), an express misrepresentation constitutes an unconscionable action or course of action that cannot be characterized as advice, judgment, or opinion, and thus violates Section 17.49(c)(3) of the Texas Deceptive Trade Practices Act ("DTPA"). In this same regard, an attorney can be held liable to his client if he violates Section 17.49(c) (3) of the DTPA by engaging in an unconscionable action or course of action.

10.     Plaintiff is a consumer under the DTPA because Plaintiff acquired goods or services from the Firm and the Firm's attorneys.  The Firm and these attorneys violated the DTPA because they engaged in false, misleading, unconscionable or deceptive acts or practices, as described above, in which Plaintiff relied upon to his detriment. In addition, the Firm at the direction of Mr. O'Quinn and Laminack, and with the assistance of Gibson, Pirtle, Martines, Molter, Farmer, Steed and Lowenberg, (1) wrongfully retained Plaintiff's settlement proceeds in order to accumulate interest on the proceeds all the while charging Plaintiff for any interest accumulated on any money borrowed by the Firm to pay alleged expenses; (2) charging Plaintiff an arbitrary 3.5% "general" silicosis charge even though Plaintiff never agreed to such charge; (3) entering into subsequent agreements with Plaintiff which materially altered the terms of the

representation without advising Plaintiff of the pros and cons, advantages and disadvantages, implication and nature of the new agreement or advising him to retain outside counsel even when the new subsequent agreements where not fair and/or reasonable to Plaintiff; (4) charging Plaintiff unnecessary and/or unreasonable expenses; (5) willfully and intentionally non-suiting claims against various Silicosis Defendants because Defendants were not prepared for trial; and (8) destroying and altering Plaintiff's files knowing that litigation was imminent.

11.      Plaintiff will show that the Firm and its lawyers' conduct, as described herein and above, was committed knowingly and intentionally as those terms are defined by Tex. Bus. & Com. Code Ann. Section 17.46 *et seq.*   Moreover, the conduct described herein and above constitutes an unconscionable action or course of action that cannot be characterized as advice, judgment or opinion.   Accordingly, the Firm and these attorneys are liable to Plaintiff for additional damages as provided by the DTPA, including treble damages and reasonable attorneys' fees necessary to bring this cause of action, all of which are being sought herein.

### F.      FRAUD, CONSTRUCTIVE FRAUD, FRAUD BY NONDISCLOSURE

12.      The conduct described above constitutes fraud, constructive fraud and/or fraud by nondisclosure. The Firm and its lawyers had a duty to make full disclosure of all material facts. Nondisclosure of material facts are the equivalent to a false representation since the Firm and these attorneys had a duty to speak but instead deliberately remained silent. Here, the Firm and the lawyers, including Steed and Lowenberg failed to disclose material information about Plaintiff's case and/or settlements as described above. The Firm and these attorneys failed to disclose these material facts notwithstanding their duty to disclose. Plaintiff trusted the Firm and these attorneys to keep them informed about their case and relied upon this trust to their detriment. As a result, Plaintiff suffered severe injury.

G.    **MISAPPLICATION OF FIDUCIARY PROPERTY**

13.    The Firm and its lawyers violated section 32.45 of the Texas Penal Code (Misapplication of Fiduciary Property).  Pursuant to section 32.45, a violation occurs when a fiduciary intentionally, knowingly or recklessly misapplies property he holds as a fiduciary in a manner that involves substantial risk of loss to the owner of the property or to a person for whose benefit the property is held.  The Firm and its lawyers owed a fiduciary duty to Plaintiff as a matter of law.  Plaintiff's cases, settlements and client files were Plaintiff's property held by the Firm and these attorneys. The Firm and these attorneys intentionally, knowingly or recklessly misapplied Plaintiff's property and settlement proceeds by (1) charging excessive and/or unnecessary expenses; (2) charging Plaintiff's general case expenses for those expenses relating to *other* silicosis clients' cases rather than specifically to Plaintiff; (3) charging an arbitrary 3.0% pro-rata share of general expenses; (4) withholding Plaintiff's settlement funds and monies, including refunds, for over six (6) years and until the threat of litigation ensued; and (5) destroying and altering Plaintiff's original files.

14.    Clearly, such conduct involved a substantial risk of loss to Plaintiff of his property, and in fact, such property was lost.  Therefore, the Firm and its lawyers violated section 32.45 of the Texas Penal Code and pursuant to Civil Practice and Remedies Code, Section 41.008 (c) the statutory caps for punitive and/or exemplary damages do not apply to this case.

H.    **NEGLIGENT SUPERVISION**

15.    Mr. O'Quinn was the sole owner of the Firm and was responsible for the supervision of the associates and partners at O'Quinn. As such, Mr. O'Quinn was personally responsible to see that Plaintiff's underlying silicosis lawsuits were handled properly by the lawyers at the Firm. Laminack and Steed were managing members of the silicosis department

and also had a duty to ensure that Plaintiff's case was properly handled. As described above, the Firm's handling of its silicosis docket was completely and horribly mismanaged. Thus, Mr. O'Quinn, individually, Steed and Laminack are jointly and severally liable for negligent supervision and all damages flowing from such negligence.

## VII
## VICARIOUS LIABILITY

1.      The O'Quinn Law Firm and/or John M. O'Quinn & Associates in addition to all other entities John M. O'Quinn operated under is liable under the doctrine of *respondeat superior* for the acts of any of its attorneys, including, but not limited to Mr. O'Quinn, Laminack, Pirtle, Martines,  Steed and Lowenberg who at all times relevant hereto were acting in the course and scope of the employment with the Firm.

## VIII
## ALTER EGO

1.      All of the entities that John M. O'Quinn practiced law under were in fact the alter ego of John M. O'Quinn individually.  John M. O'Quinn was the sole equity owner in each of the entities he practiced law under and was solely responsible for the ultimate management decisions regarding every aspect of the firms' silicosis docket.  Therefore, all liability for the actions of the lawyers at the various firms ultimately fall at the feet of John M. O'Quinn.

## IX
## DISCOVERY RULE

1.      Plaintiff affirmatively pleads the discovery rule to any defense of limitations asserted by any Defendants to any of Plaintiff's causes of action in this litigation.

## X
## ACCOUNTING

1.      Plaintiff further requests an accounting for a number of expenses that were assessed and charged against them by the Firm which are believed to be excessive in nature and/or improper. Such overcharging and assessments would amount to additional breaches of fiduciary duty and support Plaintiff's fraud and DTPA claims which can only be determined by a true and accurate accounting. Plaintiff further requests an accounting of all attorneys' fees generated by the Firm's silicosis docket and all settlement funds disbursed to Plaintiff.

## XI
## DAMAGES

**A.     ACTUAL DAMAGES**

1.      Regarding the causes of action and conduct alleged above, Plaintiff has sustained pecuniary losses that were proximately caused by the Firm and its lawyers' conduct in excess of $1,500,000.   Plaintiff hereby seeks the maximum allowable amount of actual damages that exceed the jurisdictional limits of this court.

**B.     ATTORNEYS' FEES**

2.      As a result of the Firm and its attorneys' violation of the DTPA and breach of contract, Plaintiff is entitled to reasonable attorneys' fees necessary to prosecute this action. Texas law recognizes that contingency fees can be reasonable and necessary under the circumstances. Under these circumstances, a reasonable attorneys' fee of 40% of the entire recovery should be assessed against Defendants.

**C.     EXEMPLARY DAMAGES**

3.      Based upon the Firm and its' attorneys' intentional breaches of fiduciary duty, gross negligence and fraud, Plaintiff is entitled to exemplary/punitive damages. Moreover, Texas

Civil Practice and Remedies Code, section 41.008 provides that punitive damages are not capped against a Defendant for a Plaintiff who seeks recovery of exemplary damages based on conduct based on a violation of the Texas Penal Code. Accordingly, because of the Firm and its' attorneys' conduct constitutes misapplication of fiduciary property, as outlined above, Plaintiff is entitled to unlimited exemplary damages to be determined by the jury.

**D.      TREBLE DAMAGES**

4.      Due to the Firm and its' attorneys' intentional and/or knowing violations under Texas Deceptive Trade Practices Act, Plaintiff is entitled to treble damages for which he seeks herein.

**E.      MENTAL ANGUISH DAMAGES**

5.      Plaintiff is entitled to mental anguish damages pursuant to the Texas Deceptive Trade Practices Act and because Plaintiff's mental anguish was a foreseeable consequence of the various breaches of fiduciary duty. Accordingly, Plaintiff hereby seeks mental anguish damages herein.

**F.      FEE AND EXPENSE FORFEITURE**

6.      Due to the Firm and its' attorneys' blatant and intentional breach of fiduciary duty and violations of the Penal Code, Plaintiff is entitled to the disgorgement of fees and/or expenses paid to these Defendants.  Thus, Plaintiff seeks total fee forfeiture due to the egregious conduct outlined above in an amount in excess of $1,500,000.

**XII**
**JURY DEMAND**

1.      Plaintiff desires to have a jury decide this case and makes this formal request pursuant to Federal Rule of Civil Procedure 38 and 39.

# XIII
## PRAYER

WHEREFORE, Plaintiff prays that after trial herein, that judgment be entered against all Defendants jointly and severally as prayed for, that costs of court be taxed against all Defendants, that Plaintiff have prejudgment as well as post-judgment interest, and for such other and further relief, at law and in equity to which Plaintiff may show himself to be justly entitled, to which the Court believes Plaintiff to be deserving, and for which Plaintiff will ever pray.

**JERRY A. PUSCH**
**Attorney in Charge**
Texas Bar No. 16410500
Southern District Bar No. 9414
2701 Louisiana Street
Houston, Tx 77006
(713) 225-9700
FAX (713) 523-4150
tagee@midtownlaw.net

Exhibit A

UNITED STATES DISTRICT COURT        SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Ironshore Indemnity, Inc., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| *versus* | § | Civil Action H-12-2850 |
| | § | |
| John M. O'Quinn & Associates, PLLC, *et al.*, | § | |
| | § | |
| Defendant. | § | |

## Opinion on Summary Judgment

1.     *Introduction.*

      An insurer says that it does not have a duty to defend its insured because the claim is excluded from the policy. It says that the insured knew about the claim before it sought coverage. The insured says that the claim is not excluded because the firm only knew about some of the claims. For this reason, the insurer does not have a duty to defend.

2.     *Background.*

      In the early 2000s, John M. O'Quinn & Associates, LLP, represented workers with silicosis. In 2011, a group of these clients sued the law firm for malpractice in the *House* suit. Other clients have joined the suit, and it now has more than 500 members.

      In 2006 and 2010, the firm told its insurers about potential claims from its representation of workers in the silicosis cases. The firm has $15 million in coverage for 2005-2006 and $15 million for 2009-2010.

      In 2010, Ironshore Indemnity, Inc., issued the firm an excess-liability policy for September of 2010 through September of 2011 with a $5 million limit. The primary policy for 2010 to 2011 – issued by Interstate Fire & Casualty Company – has a $10 million limit, and the first-excess policy – issued by Executive Risk Indemnity, Inc. – has a $5 million limit.

      On June 25, 2014, the court denied O'Quinn's motion to dismiss.

3.    *Defense.*

The *House* suit represents only a small group of O'Quinn's former silicosis clients. Many more clients have since filed malpractice suits against O'Quinn for the same or similar reasons. O'Quinn knew or should have known that more lawsuits would be brought against them after the *House* suit.

O'Quinn says that the policy's prior-notice exclusion does not eliminate Ironshore's duty to defend because the plaintiffs in the *House* suit brought a wide range of claims. They say that Ironshore cannot treat the entire *House* suit as a unified claim or set of related claims within the meaning of their policy. O'Quinn says that Ironshore cannot use the exclusion to cover all of the defendants, because each defendant has their own separate case against O'Quinn. Because each defendant has their own claim against O'Quinn, they say that they did not know about each claim against them, and therefore, the policy exclusion is not triggered.

Ironshore is not liable to defend O'Quinn because an exception in its policy unambiguously excludes coverage for known claims. O'Quinn knew about the *House* suit and sent letters to its insurers about settlements before the Ironshore policy issued. O'Quinn did not receive coverage from Ironshore until years after the *House* suit.

The contention that O'Quinn knew about some, but not all silicosis cases is disingenuous at best and logically impossible. As soon as one of its former clients sued it, O'Quinn knew or should have known about similar claims in other cases.

4.    *Conclusion.*

Ironshore does not have a duty to defend O'Quinn in any claims brought against them in regards to the *House* suit, or any related silica matter. O'Quinn acted deliberately and dishonestly with all of its prior silicosis clients and had clear prior knowledge of its wrongful actions.

Signed on August 31, 2015, at Houston, Texas.

_____
Lynn N. Hughes
United States District Judge